Exhibit A

Michael S. Davis (MD-6317)
Anthony I. Giacobbe, Jr. (AG-0711)
ZEICHNER ELLMAN & KRAUSE LLP
575 Lexington Avenue
New York, New York 10022
(212) 223-0400
Attorneys for Petitioner,
National Union Fire Insurance Company of Pittsburgh, Pa.

JUDGE SWAIN

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

07 CV 3355

| | |
|---|---|
| In the Matter of the Application of NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., on behalf of itself and each of the related insurers that provided coverage to respondent, <br><br> Petitioner, <br><br> For an Order Appointing an Arbitrator in an Arbitration Proceeding <br><br> - against - <br><br> CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., AND CRUM RESOURCES II, INC., D/B/A/ CRUM SERVICES, INC., <br><br> Respondents. | Case No.: <br><br> **PETITION FOR APPOINTMENT OF AN ARBITRATOR** |



Petitioner, National Union Fire Insurance Company of Pittsburgh, Pa.,

on behalf of itself and each of the related insurers that provided coverage to respondents

("National Union"), by its attorneys Zeichner Ellman & Krause LLP, as and for its

petition for appointment of an arbitrator avers, upon information and belief:

## THE PARTIES

1.     National Union is an insurance corporation duly organized under the laws of the Commonwealth of Pennsylvania, with a place of business at 70 Pine Street, New York, New York.

2.     Respondents Crum Staffing, Inc., Crum Staffing II, Inc., Crum Resources, Inc., and Crum Resources II, Inc., d/b/a/ Crum Services, Inc., ("Crum" or "Respondents") are, upon information and belief, Florida corporations that collectively do business under the trade name Crum Services, Inc., with principal offices for the transaction of business in Pinellas County, Florida.

## JURISDICTION

3.     This Court has subject matter jurisdiction over this matter due to the diversity of citizenship of the parties, under 28 U.S.C. § 1332(a)(1).  It is a dispute between citizens of different states and the amount in controversy is more than $75,000.

4.     Crum is subject to the personal jurisdiction of this Court.

## PROCEDURAL HISTORY OF RESPONDENTS' DEFAULT TO ARBITRATE

5.     Beginning as of March 31, 2005, National Union provided workers' compensation insurances coverages to Crum pursuant to an insurance program governed by a Payment Agreement dated March 31, 2005 (the "Payment Agreement"), along with schedules and an addendum (the "Addendum to the Payment Agreement").

Copies of the Payment Agreement, the schedules and the Addendum to the Payment Agreement (together, the "Agreements") are annexed collectively at Exhibit A. Pursuant to the Agreements, Crum agreed to pay certain amounts to National Union for premiums, loss reimbursements and security to National Union in connection with the insurance coverages provided to Crum by National Union.

6.    Crum filed a complaint in the Circuit Court of the Sixth Judicial Circuit in and for Pinellas County (the "Complaint"), a copy of which is annexed without exhibits as Exhibit B, referring to the Payment Agreement and seeking declaratory relief, money damages, and temporary or permanent injunctive relief arising out of the cancellation or non-renewal of certain insurance policies. National Union filed a notice of removal with the United States District Court for the Middle District of Florida, Tampa Division (the "Florida District Court"), and subsequently filed a motion with the Florida District Court pursuant to 9 U.S.C. § 4 to compel Crum to arbitrate the disputes asserted in the Complaint, as required by the governing Payment Agreement.

7.    By Order dated November 9, 2006 (the "Order"), the Florida District Court ordered National Union and Crum to arbitrate the disputes asserted in the Complaint in accordance with the arbitration clause in the Payment Agreement. A copy of the Order is annexed as Exhibit C.

8.    National Union will respond to the Complaint in arbitration and will assert a counterclaim for amounts due from Crum to National Union. While such

amounts are subject to adjustment and audits, based upon the most recent available data, the aggregate amount claimed is $1,493,612.

> 9.     The Addendum to the Payment Agreement provides:

> > **How arbitrators must be chosen:** *You* must choose one arbitrator <u>and we must</u> choose another.  They will choose the third.  If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, <u>**either party may make application only**</u> **to a court of competent jurisdiction in the City, County and State of New York.**

Addendum to the Payment Agreement, Exhibit A, p. 2 of 3 (emphasis added).

> 10.     By letter dated January 23, 2007, National Union demanded that Crum appoint its arbitrator.  A copy of the January 24, 2007 letter is annexed at Exhibit D.

> 11.     On February 21, 2007, counsel for Crum sent a letter to counsel for National Union designating William D. Hager as its party-appointed arbitrator.  A copy of the February 21, 2007 letter is annexed hereto as Exhibit E.

> 12.     The Payment Agreement provides:

> > **Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators **must be executive officers or former executive officers of property of casualty insurance or reinsurance companies or insurance brokerage companies**, or risk management officials in an industry similar to *Yours*, domiciled in the United States of

America  not under the control of either party to this Agreement.

Payment Agreement, Exhibit A, p. 8 (emphasis added).

13.    A review of the resume of Mr. Hager reveals that he is not, as required by the Payment Agreement, an active or former "executive officer[]" in a "property or casualty insurance company, reinsurance company, or an insurance brokerage company." Thus, he is not qualified to serve as an arbitrator under the express terms of the Payment Agreement. A copy of Mr. Hager's resume is annexed as Exhibit F.

14.    On February 23, 2007, counsel for National Union sent a letter to counsel for Crum stating that "Mr. Hager does not satisfy the contractual requirements because he has never been an executive officer of an insurance company" and permitting Crum an extension until March 5, 2007 to appoint its arbitrator. A copy of the February 23, 2007 letter is annexed hereto as Exhibit G.

15.    On March 2, 2007, counsel for Crum sent a letter to counsel for National Union stating that "clearly Mr. Hager's tenure as President and CEO of NCCI, Inc. ("NCCI") qualifies him as a former chief executive officer of an insurance brokerage company, which is not further defined by the agreement." A copy of the March 2, 2007 letter is annexed hereto as Exhibit H.

16.    On March 12, 2007, counsel for National Union sent a letter to counsel for Crum requesting that counsel for Crum "provide us with documentation that

NCCI is an insurance brokerage company, such as a copy of NCCI's insurance brokerage license." A copy of the March 12, 2007 letter is annexed hereto as Exhibit I.

17.    On March 14, 2007, counsel for National Union sent another letter to counsel for Crum stating "we have now been informed by NCCI that NCCI is not an insurance brokerage company." A copy of the March 14, 2007 letter is annexed hereto as Exhibit J.

18.    On March 20, 2007 counsel for Crum sent a letter to counsel for National Union stating that Crum would not appoint another arbitrator. A copy of the March 20, 2007 letter is annexed as Exhibit K.

19.    On March 21, 2007, counsel for National Union sent a letter to counsel for Crum designating Linda Martin Barber, as its party-appointed arbitrator. A copy of the March 21, 2007 letter is annexed hereto as Exhibit L.

### MR. HAGER DOES NOT MEET THE CONTRACTUAL QUALIFICATIONS TO SERVE AS ARBITRATOR UNDER THE PAYMENT AGREEMENT

20.    NCCI is not an "insurance brokerage company." An insurance brokerage company is a company that carries on the business of an insurance broker. An insurance broker is defined as:

> **BROKER,** insurance salesperson who searches the marketplace in the interest of clients, not insurance companies. Dictionary of Insurance Terms, Third Edition, Harvey W. Rubin, Ph.D., CLU, CPCU

**BROKER.** One who represents an insured in the solicitation, negotiation or procurement of contracts of insurance, and who may render services incidental to those functions. By law the broker may also be an agent of the insurer for certain purposes such as delivery of the policy or collection of the premium. <u>Glossary of Insurance Terms, Over 2,500 Definitions of the Most Commonly Used Words in the Industry</u>, 6th Edition, Merritt Publishing, Santa Monica, CA

21.    Also, the United States Court of Appeals for the Second Circuit has held:

Both New York insurance law and common law provide that insurance brokers act as agents on behalf of the insured where they are "employed by the insured to procure insurance."

<u>Evvtex Co., Inc. v. Hartley Cooper Associates Limited and Gibbs Hartley Cooper Limited</u>, 102 F.3d 1327, 1331-32 (2d Cir 1996).

22.    In fact, Mr. Hager's resume, which appears on his website explicitly describes NCCI's functions. Mr. Hager states:

Mr. Hager was appointed President and CEO of NCCI in May 1990. **NCCI is the nation's largest workers compensation and health care informatics corporation. Headquartered in Boca Raton, Florida, the corporation provides database products, software, publications and consultation services to state funds, self-insureds, independent bureaus, agents, regulatory authorities, legislatures and more than 700 insurance companies.** While under Mr. Hager's leadership, NCCI had annual revenues approaching $150 million, NCCI employed 1,000 people located in 20 offices around the United States and was and is the licensed statistical and rate advisory

organization in nearly 40 states. During Hager's leadership, NCCI had annual pricing responsibility for some $16 billion of workers compensation premiums and responsibility to gain regulatory approval of that pricing.

During Hager's tenure, NCCI doubled revenues (from $70 million to $150 million), reduced loss cost inadequacy to nearly zero (down from 25% inadequacy), brought residual markets to an underwriting break-even point (down from $2 billion in annual underwriting losses) and provided the intellectual foundation for $1.5 billion in statutory reform. Concurrently, the organization was right-sized (head count reduced from 1,500 to 1,000), firepower was substantially increased (technical and professionals have increased from 40% to 85% of the employment base), **and the organization was converted from a rate bureau to a contemporary, competitive information company.**

http://www.insurancemetrics.com/IMCNV_resume.html.    See  Exhibit  F.    (emphasis added)

23.    To confirm that NCCI is not an insurance brokerage company, counsel for National Union contacted NCCI and was referred to Mr. Terrence D. Delehanty, General Counsel and Chief Legal Officer of NCCI Holdings, Inc., who provided a letter on April 12, 2007 confirming that "National Council on Compensation Insurance, Inc. is not an 'insurance brokerage company.'"  A copy of his letter is annexed hereto as Exhibit M.

24.    Thus, neither NCCI nor Mr. Hager's resume assert that NCCI is an insurance brokerage company.

25.    Accordingly, Mr. Hager does not meet the contractual requirements to serve as an arbitrator set forth in the Payment Agreement (Exhibit A, p. 8) and Crum, therefore, is in default of its obligation to designate a qualified arbitrator within 30 days as required by the Addendum to the Payment Agreement. (Exhibit A, p. 2 of 3).

26.    Moreover, as discussed above, National Union twice requested that Crum cure its default by appointing a qualified arbitrator and consented to an extension of the time period for Crum to do so.  Crum has refused to do so.

**RELIEF REQUESTED**

27.    Petitioner requests that this Court declare that Mr. Hager does not meet the specific contracted requirements to serve as an arbitrator and that this Court appoint a qualified arbitrator in accordance with the Payment Agreement of the parties.

**WHOM TO APPOINT**

28.    As noted above, the Payment Agreement of the parties requires:

. . . all arbitrators **must be executive officers or former executive officers of property of casualty insurance or reinsurance companies or insurance brokerage companies,** or risk management officials in an industry similar to *Yours,* domiciled in the United States of America not under the control of either party to this Agreement.

On a prior occasion in another case, National Union similarly asked the New York State Supreme Court to appoint an arbitrator[1] under a similar contractual provision, and in that instance, the Court turned to ARIAS*US, an association that trains and certifies arbitrators for the insurance and reinsurance industry. See the unpublished decision of the New York State Supreme Court in National Union v. Dyneer (Exhibit N), in which the Court "reviewed candidates from the list maintained by ARIAS U.S.," and chose from that list. We ask this Court to do the same.

29.      ARIAS certifies over 300 potential arbitrators, including Mr. Hager. (Plainly then, Crum is willing to have ARIAS-certified arbitrator on the Panel.) Many, but not all, ARIAS-certified arbitrators qualify under the Payment Agreement, and, inconveniently, Mr. Hager does not.

30.      All ARIAS-certified arbitrators are listed on its web page http://www.arias-us.org. ARIAS' website also lists a more select group of individuals it recommends to serve as neutral arbitrators (referred to as "Umpires").

31.      In order to aid the Court to select qualified individuals, who are certified to be both qualified and neutral, National Union offers the following five candidates from the more select ARIAS Umpire list, and asks this Court to select from among these six names:

---

[1]    The arbitration agreement in that case, unlike the one at issue here, required that a party apply only to the New York State Supreme Court.

Janet J. Burak
Mary Ellen Burns
Ronald S. Gass
Sylvia Kaminsky
Andrew S. Walsh
Richard L. White

The ARIAS resume of each of these individuals is annexed as Exhibit O.

32.    No previous request has been made for the relief requested herein.

33.    Accordingly, National Union requests that this Court schedule an expedited hearing to appoint an Arbitrator from the list of qualified candidates proposed by Petitioner, or alternatively appoint such qualified person as the Court deems proper.

WHEREFORE, National Union requests that this Court declare that Mr. Hager does not meet the specific contractual requirements to serve as an arbitrator and that this Court appoint a qualified arbitrator in accordance with the Payment Agreement of the parties.

Dated:   New York, New York
         April 26, 2007

                              ZEICHNER ELLMAN & KRAUSE LLP
                              Attorneys for National Union Fire
                              Insurance Company of Pittsburgh, Pa.


                              By: _____
                              Michael S. Davis
                              Anthony I. Giacobbe, Jr.
                              575 Lexington Avenue
                              New York, New York 10022
                              Tel:  (212) 223-0400
                              Fax:  (212) 753-0396

11

Exhibit A

# PAYMENT AGREEMENT

For

## Insurance and Risk Management Services

effective on the 31 day of **March, 2005**

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and its ~~...~~ ...including, but not limited to:

**American Home Assurance Company
The Insurance Company of the State of Pennsylvania
National Union Fire Insurance Company of Pittsburgh, Pa.
Commerce and Industry Insurance Company
Birmingham Fire Insurance Company
Illinois National Insurance Company
American International South Insurance Company
AIU Insurance Company
American International Pacific Insurance Company
Granite State Insurance Company
Landmark Insurance Company
National Union Fire Insurance Company of Louisiana
New Hampshire Insurance Company**

And *You*, our Client

CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.

*100 S MISSOURI AVE*
*CLEARWATER  FL 33756*

in consultation with *Your* representative

*RSC INSURANCE BROKERAGE*
*160 FEDERAL STREET*
*BOSTON  MA  02110*

# PAYMENT AGREEMENT

## TABLE of CONTENTS

Title Page                                                              1

Table of Contents                                                      2

Who Has Agreed To This Agreement?                                      3

What Have *You* And We Agreed To?                                      3

When Does This Agreement Begin?                                        3

When Will This Agreement End?                                          3

Which Words Have Special Meanings In This Agreement?                   3

What Else Should *You* Know About *Your Payment Obligation*?           4

When Must *You* Pay *Your Payment Obligation*?                         4

What Is the Payment Plan?                                              4

What Is the Billing Method?                                            5

What About Collateral?                                                 6

What Is Default?                                                       7

What May We Do In Case Of Default?                                     7

How Will Disagreements Be Resolved?                                    8

To Whom Must *You* and We Give Notices?                                9

May Rights or Obligations be Assigned?                                 9

Will Past Forbearance Waive Rights under This Agreement?               9

Who Must Pay to Enforce This Agreement?                                9

How May This Agreement Be Changed?                                     9

What If the Law Changes?                                               9

Are *You* Authorized to Make This Agreement?                          9

Signatures                                                            10

Schedule of Policies and Payments                              Appended

# PAYMENT AGREEMENT

## WHO HAS AGREED TO THIS AGREEMENT?

This Agreement is between:

- *You*, the organization(s) named as "our Client" in the *Schedule*, and
- us, the insurer(s) named in the *Schedule*.

The words "we", "us" and "our" in this Agreement refer to the insurer(s) named in the *Schedule*.

## WHAT HAVE *YOU* AND WE AGREED TO?

**We have agreed** to the following:

- to provide *You* insurance and services according to the *Policies* and other agreements; and
- to extend credit to *You* by deferring our demand for full payment of the entire amount of *Your Payment Obligation* if *You* make partial payments according to this Agreement.

To induce us to agree as above,

*You* have agreed to the following:

- to pay us all *Your Payment Obligation* and to perform all *Your* other obligations according to this Agreement and *Schedule* for all entities covered by the *Policies*;
- to provide us with collateral according to this Agreement and *Schedule*;

## WHEN DOES THIS AGREEMENT BEGIN?

This Agreement begins on the Effective Date shown in the first page (the title page) of this Agreement. Unless otherwise agreed in writing, this Agreement will also apply to any *Policies* and *Schedules* that we may issue as renewals, revisions, replacements or additions to the attached *Schedule* and the *Policies* listed there.

## WHEN WILL THIS AGREEMENT END?

This Agreement will end only after *You* and we have settled and paid all obligations between *You* and us relating to this Agreement. Neither *You* nor we may cancel this Agreement without the other's consent.

## WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?

Words with special meanings in the *Policies* have the same meanings in this Agreement as they have in the *Policies*. Non-italicized capitalized words in this Agreement are defined in the *Policies*, or their meanings are otherwise described in this Agreement.

The following are definitions of other special words. Terms printed in this Agreement in italic typeface have the meanings described below.

1. **"ALAE"** means Allocated Loss Adjustment Expense as defined in the *Policies*.

2. **"Deductible Loss Reimbursements"** means the portion of any *Loss* and *ALAE* we pay that *You* must reimburse us for under any "Deductible" or "Loss Reimbursement" provisions of a *Policy*.

3. **"Loss" or "Losses"** means damages, benefits or indemnity that we become obligated to pay under the terms of the *Policies* to pay to claimants.

4. **"Policy" or "Policies"** means:

   - any of the insurance *Policies* described by their *Policy* numbers in the *Schedule*, and their replacements and renewals;
   - any additional insurance *Policies* that we may issue to *You* that *You* and we agree to make subject to this Agreement.

5. **"Retained Amount" or "Retention"** means one of the following:

   - **Self-Insured Retention:** the amount specified in the applicable *Policy* as *Your* Self-Insured Retention per occurrence, accident, offense, claim or suit; or
   - **Deductible:** the amount specified in the applicable *Policy* as the Reimbursable or Deductible portion of *Loss* per occurrence, accident, offense, claim or suit; or
   - **Loss Limit:** the portion of any *Loss* we pay because of an occurrence, offense, accident, claim or suit, that we will include in the computation of the premiums.

# PAYMENT AGREEMENT

The *Policies* show the type of *Retention* that applies to any specific occurrence, offense, accident, claim or suit.

6. **"Schedule"** means each of the attachments to this Agreement that describes specific elements of the Agreement for a specified period of time. Each *Schedule* is a part of this Agreement. Additional *Schedules* or amendments to *Schedules* may be attached to this Agreement from time to time by mutual agreement between *You* and us.

7. **"You"** or **"Your"** means the person or organization named as our Client in the title page of this Agreement, its predecessor and successor organizations, and each of its subsidiary, affiliated or associated organizations that are included as Named Insureds under any of the *Policies*. Each is jointly and severally liable to us for the entire amount of *Your Payment Obligation*.

8. **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance *Policies* and agreements with us incurred before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

- the premiums and premium surcharges,
- *Deductible Loss Reimbursements*,
- any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *You* are a self-insurer,
- any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

**Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and *ALAE*. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

## WHAT ELSE SHOULD *YOU* KNOW ABOUT *YOUR PAYMENT OBLIGATION*?

**Amounts:** We will calculate *Your Payment Obligation* according to the methods stated in the *Policies* and any other similar primary casualty insurance *Policies* and agreements between us.

*You* must abide by the results under this Agreement of any payment of *Loss* or *ALAE* that the claims service provider or we shall have made in the absence of negligence and in good faith under any of the *Policies*.

**Credit:** Credit is extended to *You* whenever *Your* payment of some or all of *Your Payment Obligation* is postponed beyond the effective date of the insurance *Policies* to which such obligations pertain. Any extension of unsecured credit to *You* under this Agreement is extended only for the duration of the *Policy* year for which it is extended. It is subject to review and revision or withdrawal at each anniversary of this Agreement or at other times in accordance with the terms of this Agreement. Any extension of credit to *You* under this Agreement, including any deferral or waiver of the collection of collateral from *You* is not an assumption by us of any of *Your* obligations to us. Any extension of credit to *You* does not limit our right to enforce *Your* performance under this Agreement.

A Credit Fee may be charged for any unsecured credit extended to *You*. The Credit Fee, if any, is shown in the *Schedule*. Any such Credit Fee is an annual fee and applies only to the *Policy* year to which such *Schedule* applies. A renewal Credit Fee may be charged for the period of any renewed extension of unsecured credit, and shall be shown in the *Schedule* pertaining thereto.

Payment of the Credit Fee, if any, is neither payment of premium for insurance of any kind nor payment of *Deductible Loss Reimbursements*.

## WHEN MUST *YOU* PAY *YOUR PAYMENT OBLIGATION*?

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment.

## WHAT IS THE PAYMENT PLAN?

# PAYMENT AGREEMENT

## Deposit and Installments

*You* must pay us a Deposit and Installments in the amounts and by the dates shown in the *Schedule* for the *Policies* described in the *Schedule*.

**Claims Payment Deposit:** If so shown in the *Schedule*, the Deposit includes a Claims Payment Deposit. The Claims Payment Deposit will not bear interest. We will return the amount of the Claim Payment Deposit to *You* when *You* have paid us all amounts due us.

If the total amount of claims we shall have paid on *Your* behalf exceeds the sum of the Claims Payment Deposit for three (3) consecutive billing periods, we may require *You* to pay us additional funds for the Claims Payment Deposit. However, the entire Claims Payment Deposit shall not exceed 250% of the average amount of the claims we had paid in each of the prior 3 periods.

## Additional Payments

*You* must also make payments in addition to the Deposit and Installments according to the Payment Method described under "Additional Payments" in the *Schedule*.

# WHAT IS THE BILLING METHOD?

**Deposit and Installments:** *You* must pay us the amounts shown in the *Schedule* as "Installments" ' ﹍ must pay us those amounts by their Due Dates shown there.

**Additional Payments:** *You* have chosen the D⎺ . Billing Method or the Autom⸲⸲⁺   ﹍drawal Method, or a combination of both. *Your* choice is shown in ᵗʰᵉ *Schedule*.

## Direct Billing Metho⸱ ⸱

⸱⸱ ﹍ᵉ Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will further bill *You* as necessary for the payment of *Losses* we must pay or have paid within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not bill more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*.

## Automatic Withdrawal Method

For the Additional Payments described under "WHAT IS THE PAYMENT PLAN?", we will draw funds from the "Automatic Withdrawal Account" described in the *Schedule* as necessary for the payment of *Losses* within *Your Retention* and *Your* share of *ALAE* covered by the *Policies*. We will not withdraw more than permitted under any Aggregate Stop or Maximum Premium or Maximum Insurance Cost provisions that apply to the *Policies*. *You* hereby authorize us to withdraw funds from that Account upon our demand.

*You* must pay enough cash into that "Automatic Withdrawal Account" to cover our expected payments of *Loss* within *Your Retention* and *Your* share of *ALAE* during the next Claims Payment Fund Coverage Period shown in the *Schedule*. The minimum amount of such cash funds is shown in the *Schedule* as "Minimum Amount". *You* must make a payment in that amount into that Account immediately whenever its balance falls below 25% of that amount. Interest earned on that Account belongs to *You*.

# PAYMENT AGREEMENT

## WHAT ABOUT COLLATERAL?

### Collateral is Required

*You* must deliver collateral acceptable to us to secure *Your Payment Obligation* at the time(s), in the form(s) and in the amount(s) shown in the *Schedule*. Subject to the terms of this Agreement, we may apply any collateral we hold in connection with this or any other similar primary casualty insurance *Policies* or agreements to *Your Payment Obligation*.

### Grant of Security Interest and Right to Offset

*You* grant us a possessory security interest in any property *You* deliver to us to secure *Your Payment Obligation*. *You* also grant us a continuing first-priority security interest and right of offset with respect to all premiums, surcharges, dividends, cash, accounts, or funds that are payable ......... .o and are now or may in the future come into our possession in connection with *Your Paym*-... *Obligation*. *You* agree to assist us in any reasonable way to enable us to perfect our interest. *You* di.e.. us to hold all such sums as collateral for *Your Payment Obligation* as they may be payable now or may become payable in the future.

### Letter of Credit

Any .etter of credit must be clean, unconditional, irrevocable and evergreen. It must be from a bank that we and the Securities Valuation Office of the National Association of Insurance Commissioners have approved and in a form acceptable to us. It must be in the amount shown in the *Schedule*.

If any letter of credit is canceled, no later than 30 days before that letter of credit expires, *You* must deliver to us a substitute letter of credit that complies with the requirements set forth above. Upon *Your* written request, we will not unreasonably withhold our consent to a reasonable extension of the time within which *You* must deliver such a substitute letter of credit to us. The substitute letter of credit must take effect no later than the date of termination of the expiring letter of credit. *Your* duty to deliver such a letter of credit will continue until *You* have satisfied all *Your* obligations under this Agreement and the *Policies*. If *You* fail to provide us with a qualifying substitute letter of credit as indicated above, we may draw upon the existing letter of credit in full.

### Other Collateral

With respect to any collateral we accept other than a letter of credit, including but not limited to any collateral we hold in trust or escrow, any agreements between *You* and us about our respective rights and obligations with respect to such collateral are incorporated by reference into this Agreement. Nothing in those agreements will limit or modify any of our rights under this Agreement.

### Collateral Reviews

The collateral we require to secure *Your Payment Obligation* is subject to reviews and revisions as described below.

We will review our collateral requirement annually. In addition, we may review our collateral requirement at any time that we may deem reasonably necessary, including at any time after an event such as but not limited to the following:

1.   the non-renewal or cancellation of any *Policy* to which this Agreement applies,

2.   the failure or violation of any financial covenants or tests, or minimum financial rating (if any) specified in the *Schedule*,

3.   the occurrence of any direct or indirect transaction for the merger or consolidation, or the conveyance, sale, transfer, dividend, spin-off, lease, or sale and lease back, of all or any material portion of *Your* property, assets, business or equity to any other entity,

4.   any material adverse change in the financial condition of *You*, *Your* subsidiaries or affiliates taken separately or in combination, or any other entity on which we rely for security or guarantee in connection with this Agreement.

*You* and we will cooperate with each other and each other's designated consultants in the conduct of such reviews.

If as a result of any review we find that we require additional collateral, *You* will provide us such additional collateral within 30 days of our written request, which shall be accompanied by a worksheet showing our calculation of the amount thereof. If a return of collateral to *You* is indicated, we will return annually the indicated amount to *You* within 30 days of our written acknowledgement thereof.

---

# PAYMENT AGREEMENT

## Collateral Adjustment Procedure

The additional collateral that *You* must provide us will be in the amount of the difference between the total unpaid amount of *Your Payment Obligation* and the total amount of *Your* collateral that we then hold. We may adjust the collateral requirement relating to the unexpired term of the *Policies* on the basis of our evaluation of *Your* financial condition. If such difference is a negative sum, that sum is the amount that we will return to *You*. However, we are not obligated to return collateral to *You* if *You* are in default of any provision of this Agreement or any other similar agreement relating to *Your* primary casualty insurance with us.

## Financial Information

*You* must provide financial information to us as a basis for our collateral reviews within 14 days after our request. If *You* are not subject to the reporting requirements of the Securities and Exchange Act of 1934, *You* must provide us copies of *Your* audited annual financial statements.

If we so request, *You* must provide us such financial information as we may reasonably deem necessary to determine *Your* financial condition, including but not limited to copies of *Your* completed quarterly financial statements. Those statements must include the following:

- balance sheet,
- income statement,
- statement of retained earnings,
- cash flow statement,
- notes to the statements, and
- any supplemental schedules.

## Reporting Requirement

Give us prompt notice of the event of any default as described in the section titled "What is a Default", or any event described in the section titled "Collateral Reviews" in this Agreement, that has happened or is about to happen.

As an alternative to the above, at *Your* option, provide us with the same notices at the same time that *You* provide such notices to any other creditor regarding any material financial or operational condition that *You* are obligated to report to such other creditor.

# WHAT IS DEFAULT?

Default is any of the following:

1. failure by *You* or any of *Your* subsidiaries or affiliates to perform within 5 days after its due date any obligation *You* or any of *Your* subsidiaries or affiliates have under this Agreement or any other agreement with us.

2. *Your* insolvency, or the occurrence of any of the following:

   - the commencement of liquidation or dissolution proceedings, *Your* general failure to pay debts as they become due, general assignment by *You* for the benefit of creditors, the filing by or against *You* of any petition, proceeding, case or action under the provisions of the United States Bankruptcy Code or other such law relating to debtors, the appointment of, or the voluntary or involuntary filing for a petition for the appointment of, a receiver, liquidator, rehabilitator, trustee, custodian or similar official to take possession or control of any of *Your* property; or

   - *Your* default on any material outstanding debt not cured within its applicable cure period, if any.

3. the cancellation by *You*, without our prior consent, of any *Policy* material to this agreement. However, *Your* concurrent cancellation of all the unexpired *Policies* shall not constitute default.

4. the discovery of any material inaccuracy or incompleteness in any representation, warranty or condition precedent *You* make in connection with this Agreement, the insurance afforded by any of the *Policies* or *Your Payment Obligation*.

# WHAT MAY WE DO IN CASE OF DEFAULT?

If default occurs, we may take reasonable and appropriate steps that are necessary to protect our interest. We will exercise good faith consistent with usual and customary commercial and credit practice in selecting and exercising such steps. We may take steps such as the following:

## PAYMENT AGREEMENT

1. We may declare the entire unpaid amount of *Your Payment Obligation* immediately due and payable.

2. We may change any or all unexpired *Policies* under Loss Reimbursement or Deductible plans to Non-Deductible plans for the remaining term of any such *Policy*, to become effective after ten days written notice to *You*. We will therewith increase the premiums for those *Policies* in accordance with our applicable rating plan.

3. We may draw upon, liquidate, or take ownership of any or all collateral we hold regardless of the form, and hold or apply such amounts to any of *Your Payment Obligations* under this Agreement or any other premium, surcharge or deductible financing agreement between *You* and us, or under any *Policies*. However we will not draw upon, liquidate, or take ownership of more collateral than is reasonably necessary to protect our interest.

4. We may require *You* to deliver to us additional collateral, including an amendment to the letter of credit or an additional letter of credit or other additional collateral. The other additional collateral, letter of credit or its amendment must conform to the requirements described above. *You* must deliver it within 15 days of *Your* receipt of a written notice from us.

5. We may cancel any or all unexpired *Policies* as if for non-payment of premium or *Deductible Loss Reimbursements*. We may apply any return of premium resulting from the cancellation to remedy any default.

6. We may withhold payment of claims to *You* or any of *Your* subsidiaries or affiliates.

7. We may satisfy *Your* obligations to us in whole or in part by set-off against any moneys, securities, collateral, consideration or property of *yours* received by, pledged to, held by or otherwise available to us in connection with *Your Payment Obligation*. *You* authorize us after any default to charge any account that *You* maintain with us in connection with *Your Payment Obligation* in order to satisfy any of *Your* obligations.

## HOW WILL DISAGREEMENTS BE RESOLVED?

### What if we disagree about payment due?

If *You* disagree with us about any amount of *Your Payment Obligation* that we have asked *You* to pay, within the time allowed for payment *You* must:

- give us written particulars about the items with which *You* disagree; and

- pay those items with which *You* do not disagree.

We will review the disputed items promptly and provide *You* with further explanations, details, or corrections. *You* must pay us the correct amounts for the disputed items within 10 days of agreement between *You* and us about their correct amounts. Any disputed items not resolved within 60 days after our response to *Your* written particulars must immediately be submitted to arbitration as set forth below. With our written consent, which shall not be unreasonably withheld, *You* may have reasonable additional time to evaluate our response to *Your* written particulars.

So long as *You* are not otherwise in default under this Agreement, we will not exercise our rights set forth under "What May We Do in Case of Default?", pending the outcome of the arbitration on the disputed amount of *Your Payment Obligation*.

### What about disputes other than disputes about payment due?

Any other unresolved dispute arising out of this Agreement must be submitted to arbitration. *You* must notify us in writing as soon as *You* have submitted a dispute to arbitration. We must notify *You* in writing as soon as we have submitted a dispute to arbitration.

### Arbitration Procedures

**How arbitrators must be chosen:** *You* must choose one arbitrator and we must choose another. They will choose the third. If *You* or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make an application to a Justice of the Supreme Court of the State of New York, County of New York and the Court will appoint the additional arbitrator or arbitrators.

**Qualifications of arbitrators:** Unless *You* and we agree otherwise, all arbitrators must be executive officers or former executive officers of property or casualty insurance or reinsurance companies or insurance brokerage companies, or risk management officials in an industry similar to *Yours*, domiciled in the United States of America not under the control of either party to this Agreement.

# PAYMENT AGREEMENT

**How the arbitration must proceed:** The arbitrators shall determine where the arbitration shall take place. The arbitration must be governed by the United States Arbitration Act, Title 9 U.S.C. Section 1, et seq. Judgment upon the award rendered by the arbitrators may be entered by a court having jurisdiction thereof.

*You* and we must both submit our respective cases to the arbitrators within 30 days of the appointment of the third arbitrator. The arbitrators must make their decision within 60 days following the termination of the hearing, unless *You* and we consent to an extension. The majority decision of any two arbitrators, when filed with *You* and us will be final and binding on *You* and on us.

The arbitrators must interpret this Agreement as an honorable engagement and not merely a legal obligation. They are relieved of all judicial formalities. They may abstain from following the strict rules of law. They must make their award to effect the general purpose of this Agreement in a reasonable manner.

The arbitrators must render their decision in writing, based upon a hearing in which evidence may be introduced without following strict rules of evidence, but in which cross-examination and rebuttal must be allowed.

The arbitrators may award compensatory money damages and interest thereupon. They may order *You* to provide collateral to the extent required by this Agreement. They will have exclusive jurisdiction over the entire matter in dispute, including any question as to its arbitrability. However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.

*Expenses of Arbitration: You* and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.

This Section will apply whether that dispute arises before or after termination of this Agreement.

## TO WHOM MUST *YOU* AND WE GIVE NOTICES?

We will mail or deliver all notices to *You* at *Your* address in the *Schedule. You* must mail or deliver all notices to our Law Representative with a copy to our Account Executive at the address specified in the *Schedule.* All notices must be in writing.

## MAY RIGHTS OR OBLIGATIONS UNDER THIS AGREEMENT BE ASSIGNED?

Neither *You* nor we may assign our rights or obligations under this Agreement without the written consent of the other, which shall not be unreasonably withheld.

## WILL PAST FORBEARANCE WAIVE RIGHTS UNDER THIS AGREEMENT?

Past forbearance, neglect or failure to enforce any or all provisions of this Agreement, or to give notice of insistence upon strict compliance with it, will not be a waiver of any rights. A waiver of rights in a past circumstance will not be a course of conduct that waives any rights in any subsequent circumstance.

## WHO MUST PAY TO ENFORCE THIS AGREEMENT?

If *You* or we fail to perform or observe any provisions under this Agreement, the other may incur reasonable additional expenses to enforce or exercise its remedies. Either *You* or we must reimburse the other upon demand and presentation of clear and convincing supporting evidence for any and all such additional expenses.

## HOW MAY THIS AGREEMENT BE CHANGED?

This Agreement may be changed only by agreement by *You* and us, as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each.

## WHAT IF THE LAW CHANGES?

If any part of this Agreement should become unenforceable because of any change in law, the remainder of this Agreement will remain in full force and effect.

## ARE *YOU* AUTHORIZED TO MAKE THIS AGREEMENT?

*You* hereby represent and warrant that *Your* execution, delivery and performance of this Agreement have been authorized by all necessary corporate actions. The individual executing this agreement on *Your* behalf has full right and authority to execute and deliver this agreement and to bind *You* jointly and severally.

# PAYMENT AGREEMENT

## SIGNATURES

**TO SIGNIFY AGREEMENT,** *You* and we have caused this Agreement to be executed by the duly authorized representatives of each.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In New York, New York,

This _5_ day of _Oct_ _2005_

Signed by _Brad Smith_

Typed Name **BRADLEY SMITH**

Title **ATTORNEY OF FACT**

For *You* or Client

**CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.**

In _Clearwater_ , _FL_ .

This _27th_ day of _September_ , _2005_

Signed by _____

Typed Name FRANK W. CRUM, JR.
PRESIDENT

Title CRUM SERVICES

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 03/31/2005 to 03/31/2006

Annexed to the PAYMENT AGREEMENT

effective on 03/31/2005

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
**American International Pacific Insurance Company**
**Granite State Insurance Company**
**Landmark Insurance Company**
**National Union Fire Insurance Company of Louisiana**
**New Hampshire Insurance Company**
and *You*, our Client

**CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.**

**100 S MISSOURI AVE**
**CLEARWATER  FL  33756**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 516950

---

## List of Addressees for Notices and Other Purposes

### Your Address:

**Contact Name:** FRANK CRUM JR.
**Company Name:** CRUM RESOURCES INC
**Street:** 100 S MISSOURI AVE
**City:** CLEARWATER    **State:** FL    **Zip:** 33756    **Phone:** (727) 726-2786

### Your Representative:

**Contact Name:** DARYL DITTMER
**Company Name:** RSC INSURANCE BROKERAGE
**Street:** 160 FEDERAL STREET
**City:** BOSTON    **State:** MA    **Zip:** 02110    **Phone:** (617) 330-5720

### Our Account Executive:

**Contact Name:** DANNY LOUIE
**Company Name:** AIGRM
**Street:** 99 HIGH STREET
**City:** BOSTON    **State:** MA    **Zip:** 02110    **Phone:** (617) 457-2955

### Our Law Representative:

**Contact Name:** KATHLEEN DONAHUE AGUILAR
**Company Name:** AIG DBG LEGAL
**Street:** 175 WATER STREET, 2ND FLOOR
**City:** NEW YORK    **State:** NY    **Zip:** 10038    **Phone:** (212) 458-7014

### Remit Payments to:

**Contact Name:**
**Company Name:** American International Companies
**Street:** PO Box 10472
**City:** Newark    **State:** NJ    **Zip:** 07193    **Phone:**

### Remit Collateral to:

**Contact Name:** Attn: Mr. Art Stillwell
**Company Name:** American International Group Inc.
**Street:** P.O.Box 923 Wall Street Station
**City:** New York    **State:** NY    **Zip:** 10268    **Phone:**

### UNDERWRITER

**Contact Name:** DANNY LOUIE
**Company Name:** AIGRM
**Street:** 99 HIGH STREET
**City:** BOSTON    **State:** MA    **Zip:** 02110    **Phone:** (617) 457-2955

### PEO UNDERWRITING GROUP

**Contact Name:** DEBRA DALY
**Company Name:** AIGRM
**Street:** 175 WATER STREET
**City:** NEW YORK    **State:** NY    **Zip:** 10038    **Phone:** (212) 458-3293

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 4781792 , WC 4781793 , WC 4781794.**

Commercial General Liability Insurance

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

Other Named Insured: Crum Staffing Inc.

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 04/28/2005 | $1,203,946 | $15,306 | $0 | $400,000 | $1,619,252 |
| 2 | 04/29/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 3 | 05/31/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 4 | 06/30/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 5 | 07/29/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 6 | 08/31/2005 | $240,777 | $0 | $0 | $0 | $240,777 |
| | Subtotals | $2,407,843 | $15,306 | $0 | $400,000 | $2,823,149 |
| | DLP* | N/A | N/A | N/A | $5,000,000 | $5,000,000 |
| | DEP* | $0 | $0 | $0 | N/A | $0 |
| | Totals | $2,407,843 | $15,306 | $0 | $5,400,000 | $7,823,149 |

**DLP** means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

**DEP** means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

**Notes**

(1) "Provision for Expenses and Excess Losses" is a part of the Premium.

(2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a **Monthly** basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

00/00/0000 01/06 9444739

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$15,000**, *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

      ☒ *You* at *Your* address shown in the *Schedule*, or

      ☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

| If Automatic Withdrawal Account applies: | Minimum Amount: |
|---|---|
| Name of Depository Institution: | |
| Address: | |
| Account Number: | |

## 4. Conversion

**The Conversion Date** for each *policy* described in section A above shall be the date _ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan

## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
|---|---|
| N/A | N/A |
| Total Collateral on Hand | $ 0 |



| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
|---|---|---|
| CLAIMS PAYMENT FUND | $400,000 | 03/31/2005 |
| ~~STEP UP LOC~~ | $1,250,000 | 03/31/2005 |
| Irrevocable Letter Of Credit to | $1,250,000 | 06/30/2005 |
| be increased on the dates and in | $1,250,000 | 09/30/2005 |
| the amounts set forth in Section | $1,250,000 | 12/31/2005 |
| C(1). | | |
| Total Additional Collateral Required | $5,400,000 | |
| Total Collateral Required | $5,400,000 | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a.  Credit Trigger:

    i.  If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii.  If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

**Name of Entity:  Type of Debt Rated:**

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
| AA- | Aa3 |  |
| A- | A3 |  |
| BBB | Baa2 |  |
| BB | Ba2 |  |

Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under Item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, **National Union Fire Insurance Company of Pittsburgh Pa.**, on behalf of itself and all its affiliates,

this _5_ day of _Oct_, 2005

Signed by _____

Typed Name **BRADLEY SMITH**

Title **ATTORNEY OF FACT**

For *You*: **CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.**

this _27TH_ day of _September_, 2005

Signed by _____

Typed Name _____ FRANK W. CRUM, JR.

PRESIDENT

Title _____ CRUM SERVICES

# 2004 Addendum

## to

## PAYMENT AGREEMENT

**By and between us**

National Union Fire Insurance Company of Pittsburgh, Pa.

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**

**The Insurance Company of the State of Pennsylvania**

**National Union Fire Insurance Company of Vermont**

**National Union Fire Insurance Company of Pittsburgh, Pa.**

**Commerce and Industry Insurance Company**

**Birmingham Fire Insurance Company**

**Illinois National Insurance Company**

**American International South Insurance Company**

**AIU Insurance Company**

**American International Pacific Insurance Company**

**Granite State Insurance Company**

**Landmark Insurance Company**

**National Union Fire Insurance Company of Louisiana**

**New Hampshire Insurance Company**

**(Company, "we", "us" or "our")**

and *You*, our Client

CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.

**100 S MISSOURI AVE**
**CLEARWATER  FL  33756**

This Addendum is attached to and forms a part of the Payment Agreement entered into between Company and Client as of the <u>31st</u> day of <u>April</u>, <u>2005</u>

1. The section entitled **WHICH WORDS HAVE SPECIAL MEANINGS IN THIS AGREEMENT?, 8. - Your Payment Obligation** is deleted and replaced with the following:

    **"Your Payment Obligation"** means the amounts that *You* must pay us for the insurance and services in accordance with the terms of the *Policies*, this Agreement, and any similar primary casualty insurance policies and agreements with us incepted before the inception date hereof. Such amounts shall include, but are not limited to, any of the following, including any portions thereof not yet due and payable:

    - the premiums and premium surcharges, taxes and assessments,

    - *Deductible Loss Reimbursements,*

    - any amount that we may have paid on *Your* behalf because of any occurrence, accident, offense, claim or suit with respect to which *you* are a self-insurer,

    - any other fees, charges, or obligations as shown in the *Schedule* or as may arise as *You* and we may agree from time to time.

    - costs and expenses incurred by any third party administrator.

    **Loss Reserves:** *Your Payment Obligation* includes any portion of the premiums, premium surcharges, *Deductible Loss Reimbursements* or other obligations that we shall have calculated on the basis of our reserves for *Loss* and

ALAE. Those reserves shall include specific reserves on known *Losses* and *ALAE*, reserves for incurred but not reported *Losses* and *ALAE*, and reserves for statistically expected development on *Losses* and *ALAE* that have been reported to us. Any *Loss* development factors we apply in determining such reserves will be based on our actuarial evaluation of relevant statistical data including, to the extent available and credible, statistical data based upon *Your* cumulative *Loss* and *ALAE* history.

**Premium Tax on Deductibles:** If any claim is made by any state regulatory authority that the amounts which *You* have paid us as deductible reimbursements hereunder are premium, and thus subject to premium taxes and/or assessments, we will notify *You* of the existence of such claim. We will give *You* the opportunity of joining with us in any proceeding to contest such claim at *Your* own expense, or to contest such claim independently at *Your* own expense, or to pay *Us* the premium taxes and assessments. In the event a determination is made that said reimbursed amounts are taxable as premium or subject to assessments and *You* have not paid *Us* for these taxes and assessments in advance, *You* agree to pay the premium taxes and/or assessments and any related fines, penalties or interest that may be imposed as a result of the non-payment of premium taxes and/or assessments applicable to the *Policies*. If *You* have paid *Us* the taxes and/or assessments and *We* unsuccessfully contest the claim, *You* will not be liable to *Us* for any related fines, penalties or interest. If *We* successfully contest the claim, the taxes and/or assessments *You* paid in advance will be refunded to *You*. Any state in which premium tax on deductible reimbursements is already included in the premium charged hereunder will be identified on the *Schedule*.

2.   The section entitled: **WHAT ELSE SHOULD YOU KNOW ABOUT YOUR PAYMENT OBLIGATION?** is amended to include the following:

We will contract with a Third Party Administrator (TPA) that you select for the adjustment of your claims under the *Policies* provided that we consent to your selection in adv........... relationship with the TPA will be governed by a claims se..vice agreement between us and the TPA, a copy of which will be made available to you upon your request. Any TPA you select must meet all of our licensing requirements. You will be responsible for any costs associated with any change from one TPA to another TPA whether we or you make at any time. We will exercise good faith consistent with usual and customary commercial practice before we change one TPA to another TPA. Any amounts we pay to any TPA on your behalf shall be considered part of Your Payment Obligation, and shall include, but not be limited to the following: cost of adjusting expense at new TPA; file transfer costs; costs or losses incurred as a result of claims handling conduct of prior TPA, including fines and penalties; fines and penalties for failure to submit accurate data to regulatory bureaus; data transfer expense; costs to retrieve or recreate information not properly maintained by prior TPA; and costs to set up new escrow account.

3.   The section entitled: **WHEN MUST YOU PAY YOUR PAYMENT OBLIGATION?** is amended to include the following:

All payments are due by the due date stated in the *Schedule*, or as respects Additional Payments, within 30 days of the later of the Invoice, Notice or Bill date or *Your* evidenced receipt date of the Invoice, Notice or Bill for each such Additional Payment. If payment is not made when due, interest will accrue on the unpaid balance daily after the due date at the Prime Rate then in effect at Citibank, N.A., NY, NY, plus 150 basis points.

4.   The section entitled: **WHAT ABOUT COLLATERAL?** is amended to include the following:

Collateral Exchange:

At our sole discretion we may approve Your substitution or exchange of one form or instrument of collateral for another. Any replacement collateral must be in a form and drawn on a bank or insurer acceptable to us. If the original collateral was in the form of cash on which interest was being earned, a substitution may result in a change to the interest rate. We will not approve your substitution or exchange of collateral if you are in Default of any of the terms of this Agreement or have triggered any applicable Financial Covenants, Tests or Minimum Credit Ratings shown in the Schedule.

5.   The section entitled: **HOW WILL DISAGREEMENTS BE RESOLVED?, ARBITRATION PROCEDURES - How arbitrators must be chosen**, is deleted and replaced by the following:

**How arbitrators must be chosen:** You must choose one arbitrator and we must choose another. They will choose the third. If you or we refuse or neglect to appoint an arbitrator within 30 days after written notice from the other party requesting it to do so, or if the two arbitrators fail to agree on a third arbitrator within 30 days of their appointment, either party may make application only to a court of competent jurisdiction in the City, County, and State of New York. Similarly, any action or proceeding concerning arbitrability, including motions to compel or to stay arbitration, may be brought only in a court of competent jurisdiction in the City, County, and State of New York.

**IN WITNESS WHEREOF,** the parties hereto have caused this Addendum to be executed by their duly authorized representatives in _____,_____ this _____ day of _____, _____.

For **National Union Fire Insurance Company of Pittsburgh, Pa.,**

On behalf of itself and its affiliates first listed above:

In New York, New York,

This _5_____ day of _____

_Oct_____  _____
_2005__

Signed by _Bradley Smith_____

Typed Name **BRADLEY SMITH**

Title **ATTORNEY OF FACT**

For **You,** our Client

**CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.**

In __Clearwater_____, _FL,_

This _27TH_ day of _September_  _2005_

Signed by _____

Typed Name _____
FRANK W. CRUM, JR.
PRESIDENT
CRUM SERVICES

Title _____

# Schedule of Policies and Payments

## Paid Loss Payments Plan

Effective from 03/31/2005 to 03/31/2006

Annexed to the PAYMENT AGREEMENT

effective on __03/31/2005__

by and between us,

**National Union Fire Insurance Company of Pittsburgh, Pa.**

On behalf of itself and all its affiliates including, but not limited to:

**American Home Assurance Company**
**The Insurance Company of the State of Pennsylvania**
**National Union Fire Insurance Company of Pittsburgh, Pa.**
**Commerce and Industry Insurance Company**
**Birmingham Fire Insurance Company**
**Illinois National Insurance Company**
**American International South Insurance Company**
**AIU Insurance Company**
**American International Pacific Insurance Company**
**Granite State Insurance Company**
**Landmark Insurance Company**
**National Union Fire Insurance Company of Louisiana**
**New Hampshire Insurance Company**
and *You*, our Client

**CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.**

**100 S MISSOURI AVE**
**CLEARWATER  FL  33756**

on behalf of *You* and all *Your* subsidiaries or affiliates except those listed below:

For our use only: 516950

---

## List of Addressees for Notices and Other Purposes

### Your Address:

Contact Name: FRANK CRUM JR.
Company Name: CRUM RESOURCES INC
Street: 100 S MISSOURI AVE
City: CLEARWATER    State: FL    Zip: 33756    Phone: (727) 726-2786

### Your Representative:

Contact Name: DARYL DITTMER
Company Name: RSC INSURANCE BROKERAGE
Street: 160 FEDERAL STREET
City: BOSTON    State: MA    Zip: 02110    Phone: (617) 330-5720

### Our Account Executive:

Contact Name: DANNY LOUIE
Company Name: AIGRM
Street: 99 HIGH STREET
City: BOSTON    State: MA    Zip: 02110    Phone: (617) 457-2955

### Our Law Representative:

Contact Name: KATHLEEN DONAHUE AGUILAR
Company Name: AIG DBG LEGAL
Street: 175 WATER STREET, 2ND FLOOR
City: NEW YORK    State: NY    Zip: 10038    Phone: (212) 458-7014

### Remit Payments to:

Contact Name:
Company Name: American International Companies
Street: PO Box 10472
City: Newark    State: NJ    Zip: 07193    Phone:

### Remit Collateral to:

Contact Name: Attn: Mr. Art Stillwell
Company Name: American International Group Inc.
Street: P.O.Box 923 Wall Street Station
City: New York    State: NY    Zip: 10268    Phone:

### UNDERWRITER

Contact Name: DANNY LOUIE
Company Name: AIGRM
Street: 99 HIGH STREET
City: BOSTON    State: MA    Zip: 02110    Phone: (617) 457-2955

### PEO UNDERWRITING GROUP

Contact Name: DEBRA DALY
Company Name: AIGRM
Street: 175 WATER STREET
City: NEW YORK    State: NY    Zip: 10038    Phone: (212) 458-3293

## A. *Policies* and Other Agreements

Workers Compensation and Employers Liability Insurance

**WC 4781792 , WC 4781793 , WC 4781794.**

Commercial General Liability Insurance

Automobile Liability Insurance

Other Insurance

Other Agreements (Describe)

Other Named Insured: Crum Staffing Inc.

## B. Payment Plan:

### 1. Cash Deposit, Installments and Estimated Deferred Amounts

| Payment No. | Due Date | Provision for Expenses And Excess Losses(1) | Special Taxes and Surcharges | Annual Credit Fee | Provision for Limited Losses(2) | *Your Estimated Payment Obligation* |
|---|---|---|---|---|---|---|
| 1 | 04/28/2005 | $1,203,946 | $15,306 | $0 | $400,000 | $1,619,252 |
| 2 | 04/29/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 3 | 05/31/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 4 | 06/30/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 5 | 07/29/2005 | $240,780 | $0 | $0 | $0 | $240,780 |
| 6 | 08/31/2005 | $240,777 | $0 | $0 | $0 | $240,777 |
| Subtotals | | $2,407,843 | $15,306 | $0 | $400,000 | $2,823,149 |
| DLP* | | N/A | N/A | N/A | $5,000,000 | $5,000,000 |
| DEP* | | $0 | $0 | $0 | N/A | $0 |
| Totals | | $2,407,843 | $15,306 | $0 | $5,400,000 | $7,823,149 |

**DLP** means "Deferred Loss Provision". This is the estimated amount *You* must pay us as "Regular Loss Payments" and "Sizeable Loss Payments" described below.

**DEP** means "Deferred Expense Provision". This is an estimated amount that *You* must pay us as follows:

| Date | Type | Amount |
|---|---|---|
| N/A | N/A | N/A |

Notes    (1) "Provision for Expenses and Excess Losses" is a part of the Premium.

          (2) "Provision for Limited Losses" includes provision for *Loss* within *Your Retention* (both Deductible and Loss Limit) and *Your* share of *ALAE*. Any "Deposit" in this column is the Claims Payment Deposit. Refer to definitions in the Payment Agreement.

### 2. Adjustments

The sums shown above are only estimated amounts. If *Your Payment Obligation* changes under the terms of the *Policies*, we will promptly notify *You* as such changes become known to us. All additional or return amounts relating thereto shall be payable in accordance with the terms of the Payment Agreement.

### 3. Additional Payments

On a <u>Monthly</u> basis, we will report to *You* the amounts of *Loss* and *ALAE* that we have paid under the *Policies*. *You* must subsequently pay us as described below.

**Regular Loss Payments:** Regular Loss Payments apply in addition to the amounts shown with Due Dates in Section B above.

We will bill *You* or withdraw funds from the Automatic Withdrawal Account (whichever Billing Method applies as shown below) at the periodic intervals stated above for the amounts of *Loss* within *Your Retention* and *Your* share of *ALAE* that we will have paid under the *Policies*, less all amounts *You* will have paid us to date as such Regular Loss Payments and the Sizable Loss Payments described below.

**Sizable Loss Payments:** If we must make payment for any *Loss* within *Your Retention* and *Your* share of *ALAE* arising out of a single accident, occurrence, offense, claim or suit that in combination exceeds the Sizable Loss Payment Amount of **$15,000**, *You* must pay us the amount of that payment of *Loss* within 10 days after *You* receive our bill.

**Billing Method:**

☒ Billing to

    ☒ *You* at *Your* address shown in the *Schedule*, or

    ☐ *Your* Representative at its address shown in the *Schedule*; or

☐ Automatic Withdrawal from the account described below.

| If Automatic Withdrawal Account applies: | Minimum Amount: |
| --- | --- |

Name of Depository Institution:

Address:

Account Number:

## 4. Conversion

The Conversion Date for each *policy* described in section A above shall be the date __ months after the inception of such *Policy*.

On or shortly after the Conversion Date upon the presentation of our invoice, *You* must pay in cash the entire unpaid amount of *Your Payment Obligation* for such *Policies*.

# C. Security Plan
## 1. Collateral

| Collateral on Hand (by Type) | Amount of Collateral |
| --- | --- |
| N/A | N/A |
| Total Collateral on Hand | $ 0 |



| Additional Collateral Required (by Type) | Amount of Collateral | Due Date |
| --- | --- | --- |
| CLAIMS PAYMENT FUND | $400,000 | 03/31/2005 |
| ~~STEP-UP LOC~~ | $1,250,000 | 03/31/2005 |
| Irrevocable Letter Of Credit to be increased on the dates and in the amounts set forth in Section C(1). | $1,250,000 | 06/30/2005 |
| | $1,250,000 | 09/30/2005 |
| | $1,250,000 | 12/31/2005 |
| Total Additional Collateral Required | $5,400,000 | |
| Total Collateral Required | $5,400,000 | |

## 2. Financial Covenants, Tests, or Minimum Credit Ratings

We may require additional collateral from *You* in the event of the following:

a. Credit Trigger:

    i. If the credit rating of the entity named below and for the type of debt described below, promulgated by Standard & Poor's Corporation ("S&P") or by Moody's Investors Services, Inc. ("Moody's"), drops below the grade shown respectively under S&P or Moody's, or

    ii. If S&P or Moody's withdraws any such rating.

We may require and *You* must deliver such additional collateral according to the Payment Agreement up to an amount such that our unsecured exposure will not exceed the amount shown as the Maximum Unsecured Exposure next to such rating in the grid below.

"Unsecured exposure" is the difference between the total unpaid amount of *Your Payment Obligation* (including any similar obligation incurred before the inception of the Payment Agreement and including any portion of *Your Payment Obligation* that has been deferred and is not yet due) and the total amount of *Your* collateral that we hold.

**Name of Entity:  Type of Debt Rated:**

### Ratings at Effective Date

| S&P | Moody's | Unsecured Exposure at Effective Date |
|-----|---------|--------------------------------------|
|     |         |                                      |
|     |         |                                      |
|     |         |                                      |

### Potential Future Ratings

| S&P | Moody's | Maximum Unsecured Exposure |
|-----|---------|----------------------------|
| AA- | Aa3     |                            |
| A-  | A3      |                            |
| BBB | Baa2    |                            |
| BB  | Ba2     |                            |

b. Other Financial Tests or Covenants:

## 3. Adjustment of Credit Fee

If the amount of unsecured exposure is changed because of *Your* delivery of additional collateral to us due to the requirements under item 2 above, the Credit Fee shall be adjusted on a pro-rata basis from the date of such delivery.

## SIGNATURES

IN WITNESS WHEREOF, *You* and we have caused this *Schedule* to be executed by the duly authorized representatives of each.

For us, National Union Fire Insurance Company of Pittsburgh Pa., on behalf of itself and all its affiliates, this 5 day of Oct , 2005
Signed by _____
Typed Name **BRADLEY SMITH**
Title **ATTORNEY OF FACT**

For *You:* CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., CRUM RESOURCES II, INC.
this 27th day of September 2005
Signed by _____
Typed Name     FRANK W. CRUM, JR.
                        PRESIDENT
Title _____
                        CRUM SERVICES

Exhibit B

**IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PINELLAS COUNTY, FLORIDA
CIVIL DIVISION**

CRUM STAFFING, INC., CRUM
STAFFING II, INC., CRUM
RESOURCES, INC., AND CRUM
RESOURCES II, INC., D/B/A CRUM
SERVICES, INC.

       Plaintiffs,

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA,

       Defendant.

_____/

*Case: 06-3755 ei*
*Div: 007*

RECEIVED
CIVIL COURT RECORDS
MAY 3 1 2006
KEN BURKE
CLERK CIRCUIT COURT
PINELLAS COUNTY

## VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT, MONEY DAMAGES, AND INJUNCTIVE RELIEF

Plaintiffs, CRUM STAFFING, INC., CRUM STAFFING II, INC., CRUM RESOURCES, INC., AND CRUM RESOURCES II, INC., D/B/A CRUM SERVICES, INC. ("Crum"), sue Defendant, NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA ("National Union") and allege:

1.    This is a civil action for declaratory judgment involving an amount in controversy in excess of $15,000, exclusive of costs, interest, and attorneys' fees, within this Court's jurisdiction under the provisions of Ch. 86, Florida Statutes, for money damages involving an amount in controversy in excess of $15,000, exclusive of costs, interest, and attorneys' fees, and for temporary and permanent injunctive relief.

2.     Plaintiffs are Florida corporations, which collectively do business under the trade name CRUM SERVICES, INC. ("Crum"), with principal offices for the transaction of business in Pinellas County, Florida.

3.     National Union is a foreign insurer duly admitted to transact and at all material times transacting the business of insurance within the State of Florida.

## GENERAL ALLEGATIONS

4.     At all material times, Crum operated a Professional Employee Organization business.  Under the auspices of its PEO business, Crum, for a fee, leased employees to its client employers involved in a variety of business pursuits within the contiguous 48 states of the United States of America.  As part of its PEO business, Crum assumed the responsibility for, among other things, employee payroll for its clients, and more pertinently, the provision of workers' compensation insurance for the clients' leased employees, in compliance with the workers' compensation laws of the various states in which it did business.

5.     In order to fulfill its contractual responsibility to its clients to provide workers' compensation insurance as aforesaid, Crum agreed with National Union for National Union to write and bind workers compensation coverage for Crum's PEO clients within the State of Florida and in the other states in which Crum did business.

6.     Pursuant to the aforesaid agreement between Crum and National Union, National Union issued for delivery in Pinellas County, Florida, a Binder of Risk Management with effective dates of March 31, 2005 through March 31, 2006.  Because the terms of the Binder's underwriting guidelines were so copiously negotiated between the parties, the Binder was not executed until September 15, 2005.  A true and correct

copy of the Binder and all attachments are attached hereto as Composite Exhibit "A." The Binder was a policy of insurance within the meaning of and subject to the provisions of Ch. 627, Florida Statutes. Pursuant to the Binder, National Union Proceeded to issue for delivery policies of workers' compensation insurance to Crum and its clients.

7.     As part of the Binder, the Payment Agreement for Insurance and Risk Management Services (Payment Agreement), at page 9 of 10, provided that the Payment Agreement could only be changed by "agreement by You [Crum] and us [National Union], as evidenced by a written addendum to this Agreement, duly executed by the authorized representatives of each."

8.     The Binder's Underwriting Criteria, at page 8 of 19, provided in pertinent part that "Crum agrees to follow [the Binder's Underwriting Guidelines], *or any amendments as agreed between [National Union] and Crum* during the term of the Agreement unless more restrictive guidelines are stated in the [National Union] Binder." [Emphasis added].

9.     The Payment Agreement, at pages 7 and 8 of 10, also defined and described events of default under the Payment Agreement, and described National Union's remedies in the event of default. Nowhere in the Payment Agreement, in the Underwriting Criteria, or in the Binder generally, were Premium Audit Data (PAD), risk reporting, or referral deficiencies, irregularities, or violations by Crum described as events of default, nor were suspension of Crum's authority to present National Union with new business, or the imposition by National Union of alterations to the Binder's Underwriting Guidelines, specifically described as remedies available to National Union in the event of default.

10.     By letter dated December 19, 2005, National Union, without prior notice to Crum, and without Crum's agreement, suspended Crum's authority to present National Union with new business from Crum's PEO program, allegedly as a result of PAD, risk reporting, and referral deficiencies, irregularities, and/or violations by Crum.  A copy of National Union's December 19, 2005 letter is attached as Exhibit "B."

11.     Subsequently, by letter dated January 18, 2006, National Union reinstated Crum's authority to present National Union with new business, imposing without Crum's agreement new Underwriting Guidelines that differed significantly, and were more restrictive, than the Underwriting Guidelines previously agreed to between Crum and National Union.   A copy of the January 18, 2006 letter and the new Underwriting Guidelines are attached as Exhibit "C."

12.     Crum protested the December 19, 2005, suspension by National Union of its authority to present new business, as well as National Union's January 18, 2006, imposition of new Underwriting Guidelines; however, in order to avoid the necessity of canceling its policies with National Union, and in an effort to mitigate its damages, Crum acquiesced to National Union's unilateral and capricious actions, as described above.

13.     Thereafter, on the date of the expiration of the Binder period on March 31, 2006, National Union demanded, in contravention of the Collateral provisions at pages 6 and 7 of the Payment Agreement, collateral in the amount of $3,875,000 as a condition for the renewal of the Binder, which constituted a significant and unjustifiable increase over the $2,126,133 collateral delivered under the original Binder.  In addition, National Union demanded, as a condition for the renewal of the Binder, payment obligations in

contravention of the Payment Obligation provisions at page 4 of 10 of the Payment Agreement.

14.    On April 6, 2006, Crum, by and through its counsel, advised National Union that the aforesaid renewal conditions were unacceptable to Crum, and that under Section 627.4133(1)(a), Florida Statutes, Crum was entitled to 45 days notice of renewal premium. Additionally, the April 6, 2006 letter advised National Union that its material changes in the terms and conditions of coverage constituted a "non-renewal" of the Binder within the meaning of Section 627.4133, entitling Crum to 45 days written notice of same. A copy of Crum's counsel's April 6, 2006, letter is attached as Exhibit "D."

15.    By letter dated April 12, 2006, a copy of which is attached as Exhibit "E," National Union's counsel acknowledged that the Binder, and its renewal and/or non-renewal, were governed by the provisions of Ch. 627, Florida Statutes, and specifically, that the renewal premium and non-renewal provisions of Section 627.4133 applied to the Binder. National Union's counsel, in violation of the requirements of Section 627.4133, advised that failure on Crum's part to remit the premium allegedly due, or the collateral demanded, on or before May 1, 2006, would result in cancellation of the binder, and the policies issued pursuant thereto. The written notice of the renewal premium and the notice of non-renewal, if they were effective at all, violated the 45-day notice requirement of Section 627.4133.

16.    Thereafter, National Union communicated directly with many of Crum's PEO clients regarding its purported cancellation of the policies issued pursuant to the Binder. An example of such communications is attached as Exhibit "F." The purported cancellations did not comply with Section 627.4133, in that they were notices of

cancellation, rather than non-renewal, and further, they falsely stated that the reason for the purported cancellation was non-payment of premium by Crum.

## COUNT I – DECLARATORY JUDGMENT

17.    Crum reavers and incorporates by reference the allegations of paragraphs 1 through 15, as if fully set forth herein.

18.    There now exists a genuine and justiciable controversy between the parties based upon the following:

a.    Crum contends that the December 19, 2005, suspension by National Union of Crum's authority to present National Union with new business constituted a material breach of the Payment Agreement, the Underwriting Guidelines, and the Binder generally, in that National Union had no right, express or implied, under the Binder to unilaterally suspend Crum's authority to present new business for PAD, risk reporting, and referral deficiencies, irregularities, and/or violations by Crum, or for any other reason.

b.    Crum contends that National Union's unilateral imposition of new Underwriting Guidelines on January 19, 2006, constituted a material breach of the Payment Agreement, the Underwriting Guidelines, and the Binder generally, in that the agreement between the parties gave National Union no right to alter the Underwriting Guidelines without Crum's written agreement.

c.     Crum contends that National Union's demand for collateral in the amount of $3,875,000, as well as its demand for substantial alteration of Crum's payment obligations, as conditions for renewal, constituted material breaches of the Binder and its provisions.

d.     Crum contends that National Union's purported renewal premium notice, and its purported non-renewal of the binder, were ineffective, and that National Union's purported cancellation notices to Crum's clients were ineffective, as violative of Section 627.4133, Florida Statutes, and other provisions of Ch. 627, Florida Statutes, and that therefore, National Union continues on the risk as to any and all policies of workers' compensation insurance issued under the Binder prior to March 31, 2006, which policies continue in full force and effect.

e.     National Union, on the other hand, has contended and continues to maintain that its actions as described in subparagraphs a. through c., *supra*, were not in violation of the Binder, and that its purported non-renewal and/or cancellation of the Binder and the policies issued pursuant thereto were effective and compliant with the Binder and the provisions of Ch. 627, Florida Statutes.

19.     By virtue of the premises, Crum is in doubt as to the rights, liabilities, and obligations of the parties under the Binder and/or the policies issued pursuant thereto, as well as under Ch. 627, Florida Statutes.

20.    Under the provisions of Ch. 86, Florida Statutes, Crum is entitled to a declaration of the rights, liabilities, and obligations of the parties under the Binder, the policies issued pursuant thereto, and under Ch. 627, Florida Statutes.

21.    Crum has been required to retain the services of the undersigned counsel in order to prosecute this action for declaratory judgment, and has agreed to pay them a reasonable fee.

WHEREFORE, Crum prays that this Court take jurisdiction of the parties hereto and the subject matter hereof, and in due course, adjudicate all rights, liabilities, and obligations under the Binder, the policies issued pursuant thereto, and the applicable provisions of the Florida Statutes; and in due course enter declaratory judgment in favor of Crum and against National Union, declaring and decreeing that National Union materially breached its obligations as aforesaid to Crum under the Binder, and that National Union's purported non-renewal and/or cancellation of the Binder, as well as any and all policies issued pursuant thereto, was ineffective, and that National Union's obligations under the Binder and the policies issued pursuant thereto continue in full force and effect; and that this Court enter such other and further orders as may be necessary to fully resolve and adjudicate all controversies extant between the parties; and that this Court award unto Crum the costs of maintaining this action, as well as reasonable attorneys' fees pursuant to Section 627.428, Florida Statutes; and for such other and further relief as may appear to this Court just and proper under the circumstances. Crum further demands trial by jury on all issues thereby triable.

## COUNT II – MONEY DAMAGES FOR BREACH OF CONTRACT

22.    Crum reavers and incorporates by reference the allegations of paragraphs 1 through 15, as if fully set forth herein.

23.    National Union's December 19, 2005, suspension of Crum's authority to present National Union with new business constituted a material breach of National Union's obligations under the Payment Agreement, the Underwriting Guidelines, and the Binder.

24.    National Union's unilateral imposition of new Underwriting Guidelines on January 18, 2006, constitutes a material breach of National Union's obligations under the Payment Agreement, the Underwriting Guidelines, and the Binder.

25.    As a direct and legal result of National Union's material breaches of its obligations under the Payment Agreement, the Underwriting Guidelines, and the Binder, as aforesaid, Crum has been damaged in that it lost existing clients, lost prospective new clients, and it was forced to secure alternative workers' compensation coverage for existing and new clients at increased premium rates.

26.    National Union's purported non-renewal and/or cancellation of the Binder and the policies issued pursuant thereto constituted material breaches of the Collateral provisions and the Payment Obligation provisions of the Payment Agreement and the Binder.

27.    As a direct and legal result of National Union's material breaches of the Collateral provisions and the Payment Obligation provisions of the Payment Agreement and the Binder, Crum has been damaged in that it lost existing clients, lost prospective

new clients, and it was forced to secure alternative workers' compensation coverage for existing and new clients at increased premium rates.

28.    As a direct and legal result of National Union's breaches of its insurance contract as aforesaid, Crum has been required to retain the services of the undersigned counsel, and has agreed to pay them a reasonable fee.

WHEREFORE, Crum demands judgment against National Union for compensatory damages in an amount in excess of $15,000, along with the costs of this action, prejudgment interest, and a reasonable attorneys' fee pursuant to Section 627.428, Florida Statutes. Crum further demands trial by jury on all issues thereby triable.

## COUNT III – MONEY DAMAGES FOR DEFAMATION

29.    Crum reavers and incorporates by reference the allegations of paragraphs 1 through 15, as if fully set forth herein.

30.    National Union's numerous written statements to Crum's clients that their policies were being cancelled for failure on the part of Crum to remit premiums, as alleged in paragraph 15 hereof, were false, libelous, and defamatory, in that their natural consequence was to imply that Crum had failed to pay premiums for workers' compensation coverage, and/or that Crum was insolvent or incapable of meeting, or unwilling to meet, its financial obligations.

31.    The aforesaid statements were made by National Union with actual malice and/or with malice in fact, and were made with specific intent by National Union to damage Crum's business and to cast Crum in an unfavorable light with its existing and potential clients.

32.    The aforesaid statements were known by National Union to be false at the time they were made.

33.    The false, libelous, and defamatory statements made by National Union as aforesaid were known by National Union at the time they were made to have the natural and certain effect of damaging, and did in fact damage, Crum in its reputation and standing in the pertinent business community.

34.    As a further direct and legal consequence of National Union's false, libelous, and defamatory statements, Crum lost existing and potential new clients.

35.    By letter dated May 10, 2006, a copy of which is attached as Exhibit "G," Cru, by and through its counsel, demanded that National Union retract all of the false, libelous, and defamatory statements made by it, and to cease and desist from making further, similar statements.  National Union has, to date, failed and refused to make the demanded retractions, and has ignored Crum's demand to cease and desist from making further, similar statements.

WHEREFORE, Crum demands judgment against National Union for compensatory damages in an amount in excess of $15,000, along with the costs of this action.  Crum further demands trial by jury on all issues thereby triable.

## COUNT IV – TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

36.    Crum reavers and incorporates by reference paragraphs 1 through 15, and 30 through 35, as if fully set forth herein.

37.    Should National Union continue to make false, libelous, and defamatory statements to Crum's clients such as those described in paragraphs 15 and 30 hereof,

11

Crum will suffer additional damages in the form of loss to its reputation and standing in the pertinent business community, and will continue to suffer the loss of existing and potential new clients.

38.    Crum has no adequate remedy at law to redress the damage that may be inflected by such future, similar false, libelous, and defamatory statements by National Union.

39.    Crum will be irreparable harmed by such future, similar false, libelous, and defamatory utterances by National Union.

40.    There exists a substantial likelihood of success on the merits of this action by Crum.

41.    The public interest will be subserved by enjoining National Union from continuing to make future, similar false, libelous, and defamatory utterances.

42.    Crum anticipates that if National Union is not enjoined from making future, similar false, libelous, and defamatory utterances, it will continue to make them.

WHEREFORE, Crum prays that this Court grant temporary and permanent injunctive relief against National Union, enjoining it from stating orally or in writing to Crum's clients that their workers' compensation policies have been or will be cancelled or non-renewed as the result of Crum's failure to remit premiums, or as the result of any default on the part of Crum to meet its financial or other obligations to National Union, or in any other way implying to Crum's clients that their policies are being cancelled or non-renewed as the result of any default or failure by Crum to meet its contractual obligations to National Union; and that this Court award to Crum the costs of this action.

STATE OF FLORIDA

COUNTY OF PINELLAS

Before me, the undersigned authority, duly authorized to administer oaths, appeared an individual personally known to me to be Elise Lynn, Vice President of Legal and Business Affairs of the Plaintiff herein, Crum Services, Inc., who after having been sworn, deposes and states that the facts and allegations set forth in the foregoing Verified Complaint for Declaratory Judgment, Money Damages, and Injunctive Relief are true and correct to the best of her knowledge.

_Elise Lyn_
ELISE LYNN

_Rhonda C. Wagers_
NOTARY PUBLIC

My Commission Expires:

RHONDA C. WAGERS
Notary Public, State of Florida
My Commission Expires April 25, 2010
Commission No. # DD528445

13

**DANIEL P. MITCHELL, ESQUIRE**
Florida Bar No. 302937
**ROBERT H. BONANNO, JR., ESQUIRE**
Florida Bar No. 506931
GRAYROBINSON, P.A.
201 N. Franklin Street, Suite 2200
Tampa, Florida 33602
Telephone: (813) 273-5100
Facsimile: (813) 273-5145
Email: dmitchell@gray-robinson.com
*Attorneys for Plaintiff*

\285128\2 - # 751440 v1

14

Exhibit C

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

CRUM STAFFING, INC., CRUM
STAFFING II, INC., CRUM
RESOURCES, INC., AND CRUM
RESOURCES II., D/B/A CRUM
SERVICES, INC.
        Plaintiffs,

                                  Case No.: 8:06-CV-1222-T-17TGW

vs.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.
        Defendant.

_____/

## ORDER ON DEFENDANT'S MOTION STAY ACTION SUBJECT TO
## ARBITRATION AND TO COMPEL ARBITRATION

    This cause is before the Court pursuant to Defendant's, National Union Fire
Insurance Co. of Pittsburgh ("National Union"), Motion to Stay Action Subject to
Arbitration and to Compel Arbitration (Docket No. 4), filed July, 10, 2006. The Response
(Docket No. 7) was filed on July 20, 2006, by Plaintiff Crum Staffing, Inc. ("Crum"),
with National Union filing a reply (Docket No. 11) on August 4, 2006.

## BACKGROUND

    Crum operated a Professional Employee Organization ("PEO") business where, for
a fee, Crum would lease its employees to its client employers, all of which were involved
in a variety of different business industries. Crum assumed responsibility for the wages of
its employees, but more importantly, the worker's compensation insurance for the clients'
leased employees. In order to fulfill this contractual responsibility of providing workers'
compensation, Crum contracted with National Union for it to write and provide workers'
compensation coverage for Crum's PEO clients – clients within the state of Florida and
elsewhere throughout 47 other states.

Crum's complaint (Docket No. 2) prays for (i) declaratory relief; (ii) money damages for an alleged breach of contract; (iii) money damages due to defamation emanating from the cancellation notices sent by National Union to Crum's clients; and (iv) the court to temporarily and permanently enjoin National Union from making any further statements containing defamatory remarks. This entire dispute started when National Union suspended Crum's authority to present National Union with new business from Crum's PEO program allegedly due to a series of risk and reporting irregularities or deficiencies. The coverage was eventually restored to Crum, but not without substantial protest.

It is important to note that the insurance policy between Crum and National Insurance contains four sections, all of which make the contract a whole. The Arbitration Clause is found in the Payment Agreement section of the contract, and states that arbitration will proceed when there is a dispute specifically concerning payment obligations, as well as *"[a]ny other unresolved dispute arising out of this agreement...."*

National Insurance now seeks a ruling to stay this current federal complaint brought by Crum, and to compel arbitration based on Crum's four causes of action.

## DISCUSSION

The main issue in front of this Court is whether said irregularities and deficiencies, as well as the other claims asserted by Crum in its complaint (Docket No. 2), fit within this broad language of the Arbitration Clause, as well as if it falls within the guise of the Federal Arbitration Act ("FAA"). Several other arbitration issues are discussed, including attorney's fees, punitive damages, and the McCarran-Ferguson Act.

## I.  Contract Language and the Application of Federal Arbitration Act

The Federal Arbitration Act presumes that courts will abide by contractual arbitration agreements, and provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid,

irrevocable, and enforceable, save upon such grounds that exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (2000). In sum, the FAA makes enforceable a written arbitration provision in a contract that involves the use of interstate commerce. Congress enacted this law in order to put an end to the longstanding judicial hostility of arbitration agreements that existed during early English common law, while at the same time placing these agreements "upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991).

As accurately stated by the Movant, since this Action involves interstate commerce (Crum and National Insurance conduct their business relationship in 48 states) – and because the Payment Agreement expressly provides for arbitration in accordance with the FAA – the FAA shall apply to this case. Accordingly, the FAA establishes that any doubts concerning the scope of arbitrable issues "should be resolved in favor of arbitration..." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24-25 (1983). The Eleventh Circuit favors such liberal construction of federal arbitration policy. *Jenkins v. First American Cash Advance of Georgia*, 400 F.3d 868, 874 (11th Cir, 2005).

Although construing the FAA in a liberal manner, the Court still must look at the specific facts at issue concerning this Action. This Court reads the phrase "[a]ny other unresolved dispute arising out of this agreement...." – which is found in the Payment Agreement portion of the insurance policy – to be broad enough to cover not only payment disputes, but also to encompass the other four claims asserted by the Plaintiff. Absent language to the contrary, this Court feels it is necessary to enforce the Arbitration Clause set forth between the two parties. The FAA "leaves no place for the exercise of discretion, but instead mandates that district courts <u>shall</u> direct the parties to proceed to arbitration." *Hudson Global Resources Mgt. v. Beck*, 2006 WL 1722353, at *3 (M.D. Fla. June 20, 2006) (quoting *Dean Witter Reynolds, Inc., v. Byrd*, 470 U.S. 213 at 218 (1985) (emphasis in original)).

Even the Plaintiff concedes that these four segments "unitedly created the policy of insurance" between the parties (Docket No. 7, Page 8). As a result, the Arbitration Clause should encompass all disputes arising out of this agreement, including all four of the issues raised in Crum's complaint, and not just issues dealing with payment. Furthermore, a closer examination of Page 8 of the Payment Agreement allows one to notice the heading that precedes the "arising under" language, and that heading asks: ***"What about disputes other than disputes about payment due?"*** The answer clearly states "arbitration" is the method to pursue, and that is why the supposed ambiguity of this entire clause is non-existent. This Court sees no compelling reason why it should alter the words or meaning of this bargained-for contract between Crum and National Insurance.

## II.  Attorney's Fees

Crum, however, raises another important issue. This Court must look at the following language and decide whether it voids the Arbitration Clause in its entirety:

> *Expenses of Arbitration: You and we must each bear the expense of our respective arbitrator and must jointly and equally bear with each other the expense of the third arbitrator and of the arbitration.*

Crum argues that this provision is unlawful and prevents it from exercising its statutory remedies as prescribed by Florida's insurance code mainly because this clause limits attorney's fees. If this clause explicitly limited attorney's fees, which it does not, then Crum would certainly have a claim for invalidating the Arbitration Clause in its entirety because, in essence, that clause would limit the statutorily-prescribed remedies of attorney fees. Fla. Stat. § 627.428(4) (2006). In fact, if Crum prevails in arbitration, it is not precluded from requesting this Court to confirm the arbitration award and to grant it a reasonable amount of attorney's fees.

## III.  Punitive Damages

Similar to its argument concerning attorney's fees, Crum asserts that there is unlawful limitation of its statutory remedies, but this time in the context of punitive damages. The Arbitration Clause states:

> *However, they will not have the power to award exemplary damages or punitive damages, however denominated, whether or not multiplied, whether imposed by law or otherwise.*

Although this language has the potential to be an issue in the future, this Court is not inclined to negate the entire Arbitration Clause as of this moment. This issue is not yet ripe; Crum has not alleged a claim seeking punitive damages, and it is very likely that Crum's existing claims do not support a claim for such damages.

IV. **McCarran-Ferguson Act**

This Court declines to address the issue concerning the McCarran-Ferguson Act due to its lack of relevance to the case at bar. Accordingly, it is

**ORDERED**, that the Motion Stay Action and Subject to Arbitration and to Compel Arbitration be **GRANTED**; the Clerk of Court is **DIRECTED** to **ADMINISTRATIVELY CLOSE** this case pending the completion of the arbitration between the parties.

**DONE and ORDERED** in Chambers, in Tampa, Florida, on the 9th day of November, 2006.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

CC: All parties and counsel of record